[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14077

_____

D.C. Docket No. 0:16-cv-62480-DPG

JOHN SALCEDO,
individually and on behalf of others similarly situated,

Plaintiff - Appellee,

versus

ALEX HANNA,
an individual,
THE LAW OFFICES OF ALEX HANNA, P.A.,
a Florida Professional Association,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 28, 2019)

Before JILL PRYOR and BRANCH, Circuit Judges, and REEVES,* District
Judge.

_____

* Honorable Danny C. Reeves, United States District Judge for the Eastern District of Kentucky,
sitting by designation.

BRANCH, Circuit Judge:

Is receiving a single unsolicited text message, sent in violation of a federal statute, a concrete injury in fact that establishes standing to sue in federal court? To answer that question, we have examined the statute, our precedent, and—following the Supreme Court's guidance—history and the judgment of Congress, and we conclude that the allegations in this suit do not establish standing.

## I.  BACKGROUND

At 9:56 a.m. on August 12, 2016, John Salcedo, a former client of Florida attorney Alex Hanna and his law firm,[1] received a multimedia text message from Hanna offering a ten percent discount on his services.

Salcedo filed suit in the district court as the representative of a putative class of former Hanna clients who received unsolicited text messages from Hanna in the past four years, alleging violations of the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227(b)(1)(A)(iii).[2] He sought, among other relief, statutory damages of $500 per text message and treble damages of $1,500 per text

---

[1] For simplicity, and without implying any view as to Mr. Hanna's possible personal liability, throughout this opinion we will refer to both defendants—Mr. Hanna and his law firm—collectively as "Hanna."

[2] "It shall be unlawful for any person within the United States . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service . . . ." 47 U.S.C. § 227(b)(1)(A)(iii).

message sent willfully or knowingly. *See* 47 U.S.C. § 227(b)(3).

Hanna moved to dismiss the complaint for lack of standing, arguing in the alternative that it should be dismissed as to Mr. Hanna for failure to state a claim against him and that certain parts of the complaint should be stricken. The district court disagreed, finding in relevant part that Salcedo had standing under *Mohamed v. Off Lease Only, Inc.*, No. 15-23352-Civ-COOKE/TORRES, 2017 WL 1080342 (S.D. Fla. Mar. 22, 2017). However, finding that its order "involves a controlling question of law as to which there is a substantial ground for difference of opinion," the court allowed Salcedo to pursue an interlocutory appeal and stayed its proceedings pending appeal. A panel of our Court granted Hanna's petition for permission to appeal under 28 U.S.C. § 1292(b). We now consider his appeal.

## II.  STANDARD OF REVIEW

"We review standing determinations *de novo*." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 975 (11th Cir. 2005).

## III.  DISCUSSION

Our analysis proceeds as follows. We first introduce the TCPA, the statute under which Salcedo has filed suit. Next, we discuss the standing requirements of Article III of the Constitution, which help to define our limited power to resolve only cases or controversies. We then turn to Salcedo's particular allegations of harm and analyze them in view of our Circuit precedent, history, and the judgment

3

of Congress.

## A. The Telephone Consumer Privacy Act of 1991

Because it found that "residential telephone subscribers consider automated or prerecorded telephone calls . . . to be a nuisance and an invasion of privacy," Telephone Consumer Protection Act of 1991, S. 1462, 102d Cong., Pub. L. No. 102-243, § 2, ¶ 10 (1991), in 1991 Congress enacted the TCPA to restrict interstate telemarketing. The TCPA thus prohibits using automatic telephone dialing systems to call residential or cellular telephone lines without the consent of the called party. 47 U.S.C. § 227(b)(1)(A)(iii), (B). It also prohibits sending unsolicited advertisements via facsimile machine. *Id.* § 227(b)(1)(C). It authorizes the Federal Communications Commission ("FCC") to enact implementing regulations. *Id.* § 227(b)(2). Finally for our purposes, the TCPA creates a private right of action whereby a person or entity may seek compensatory or injunctive relief against violators. *Id.* § 227(b)(3).

There have been two relevant updates to the TCPA and its enforcement regime since 1991. First, in October 1992, Congress amended the TCPA to allow the FCC to exempt free-to-receive cellular calls if it so chooses. *Id.* § 227(b)(2)(C). The FCC has not done so. Second, the statute has been silent as to text messaging, for that medium did not exist in 1991. But under its TCPA rulemaking authority, the FCC has applied the statute's regulations of voice calls to text messages. 30

4

FCC Rcd. 7961, 7964 n.3, 7978–79, 8016–22 (2015); 18 FCC Rcd. 14014, 14115 (2003); *see also Campbell–Ewald Co. v. Gomez*, 136 S. Ct. 663, 667 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)."). Thus, Salcedo's complaint facially appears to state a cause of action under the TCPA as interpreted by the FCC.

## B.  Article III Standing

Not every right created by Congress or defined by an executive agency is automatically enforceable in the federal courts. Our tripartite system of government recognizes that "there is no liberty if the power of judging be not separated from the legislative and executive powers." *The Federalist No. 78*, at 465 (Alexander Hamilton) (Clinton Rossiter ed. 1961). To protect this separation of powers, we must assure ourselves that our exercise of jurisdiction falls within the Constitution's grant of judicial power.

Article III vests the judicial power in the federal courts and extends that power to "Cases" and "Controversies." U.S. Const. art. III, §§ 1–2. One tool for determining that the matters before us are truly cases or controversies, as understood by Article III, is the doctrine of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "The law of Article III standing . . . serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Even when

5

those political branches appear to have granted us jurisdiction by statute and rule, we are still obliged to examine whether jurisdiction exists under the Constitution.

As the Supreme Court has explained, the "irreducible constitutional minimum" to establish Article III standing requires three elements. *Lujan*, 504 U.S. at 560. "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan*, 504 U.S. at 560–61). It is the first element—the "foremost" of the three, *id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998))—that is disputed in this appeal and to which we now turn.

To establish standing, an injury in fact must be concrete.[3] *Id.* at 1548. "A 'concrete' injury must be '*de facto*'; that is, it must actually exist," as opposed to being hypothetical or speculative. *Id.* A concrete injury need be only an "identifiable trifle." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) (noting that sufficiently concrete injuries have included a fraction of a vote, a $5 fine and costs, and a $1.50 poll tax). But sometimes plaintiffs allege intangible injuries that we cannot so

---

[3] An injury in fact must also be particularized, that is, affecting the plaintiff "in a personal and individual way." *Spokeo*, 136 S. Ct at 1548 (quoting *Lujan*, 504 U.S. at 560 n.1). It is undisputed that Salcedo's allegations are of a personal and individual nature. As the would-be class representative, Salcedo must establish his own personal, concrete injury notwithstanding whatever injuries may have been suffered by the other members of the class. *Id.* at 1547 n.6.

easily identify.

When the concreteness of an alleged injury is difficult to recognize, we look to "history and the judgment of Congress" for guidance. *Spokeo*, 136 S. Ct. at 1549. But an act of Congress that creates a statutory right and a private right of action to sue does not automatically create standing; "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.*[4] "[T]he requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009).

## C.  Eleventh Circuit Precedent

Because Salcedo bears the burden of establishing federal jurisdiction, *Lujan*, 504 U.S. at 561, we look to the substance of his amended complaint's allegations to determine if he has standing due to a concrete injury. Salcedo alleged that receiving the one text message "caused Plaintiff to waste his time answering or otherwise addressing the message. While doing so, both Plaintiff and his cellular

---

[4] Recognizing that "a bare procedural violation" of a statute "may result in no harm," *Spokeo* reaffirms the proposition that we must always look for concrete harm when assessing Article III standing. *See* 136 S. Ct. at 1550. In some contexts this will mean identifying purely speculative "harm" that never actually materializes as failing to allege an injury in fact. *See, e.g.*, *Nicklaw v. CitiMortgage, Inc.*, 839 F.3d 998, 1003 (11th Cir. 2016), *reh'g en banc denied*, 855 F.3d 1265 (11th Cir. 2017) (holding that a violation of the mortgage satisfaction reporting requirements of a state law resulted in no concrete harm to the plaintiff).

But we should not ignore the Supreme Court's guidance in *Spokeo* in cases that purport to allege more than merely technical statutory violations. This appeal presents a close question in which we must determine whether Salcedo's allegations are real and concrete as opposed to figmentary. *Spokeo*'s instruction to consider history and the judgment of Congress, *id.* at 1549, helpfully guides us in our conclusion that Salcedo has not alleged a concrete injury in fact.

phone were unavailable for otherwise legitimate pursuits." He further alleged that the message also "resulted in an invasion of Plaintiff's privacy and right to enjoy the full utility of his cellular device."

These allegations are qualitatively different from those in our Circuit precedent that have been successful in establishing standing to sue over a single violation of the TCPA. In *Palm Beach Golf Center–Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1252 (11th Cir. 2015), we found standing for a plaintiff who alleged that receiving a junk fax in violation of the TCPA harmed him because, during the minute or so that it took to receive and process the fax message, his fax machine was unavailable for receiving legitimate business messages. *Accord Florence Endocrine Clinic, PLLC v. Arriva Med., LLC*, 858 F.3d 1362, 1366 (11th Cir. 2017) (considering also "the cost of printing the unsolicited fax"). To the extent we have relied on tangible costs such as the consumption of paper and ink or toner to establish injury in fact, Salcedo cannot so rely, since receiving a text message uses no paper, ink, or toner. His complaint alleges generally that some text messages cause recipients to incur costs to their wireless service providers, but he has not alleged specifically that Hanna's text cost him any money.

Salcedo's allegations of intangible costs, on the other hand, bear some facial similarities to those in *Palm Beach Golf*. But they differ in kind, rendering *Palm*

8

*Beach Golf* inapplicable. At oral argument, Salcedo asserted that receiving Hanna's message was comparable to using a minute of fax machine time, but his complaint does not so allege. Rather, it alleges time wasted only generally. In the absence of a specific time allegation, we decline to assume an equivalence to the facts of *Palm Beach Golf* when receiving a fax message is qualitatively different from receiving a text message. A fax message consumes the receiving device entirely, while a text message consumes the receiving device not at all. A cell phone user can continue to use all of the device's functions, including receiving other messages, while it is receiving a text message.

Salcedo also makes an allegation about unavailability, but that too is distinct from *Palm Beach Golf*. There, we were concerned about the fully realized opportunity cost of being unable to receive other faxes for a full minute. By contrast, Salcedo has alleged no particular loss of opportunity. A fax machine's inability to receive another message while processing a junk fax has no analogy with cell phones and text messaging. Salcedo's assertion that he and his phone were unavailable appears only to recite language we used in *Palm Beach Golf*. *Cf.* 781 F.3d at 1252 (quoting H.R. Rep. 102-317, at 10 (1991)). We are entitled to look past this conclusory recitation to the actual factual substance of Salcedo's allegations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("we are not bound to accept as true a legal conclusion couched as a factual allegation").

9

Thus, Circuit precedent in *Palm Beach Golf* does not dictate the outcome of this appeal. And, for reasons we will discuss below, we find our sister circuit's decision involving this precise issue unpersuasive. *See Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (holding that the receipt of two unsolicited text messages constituted an injury in fact).[5] In the absence of controlling authority, we turn our analysis to the framework outlined by the Supreme Court in *Spokeo*. We look to history and the judgment of Congress to see whether they support treating Salcedo's allegations as a concrete injury in fact. Our examination reveals little support for so doing.

### D.  The Judgment of Congress

We first note what Congress has said in the TCPA's provisions and findings[6] about harms from telemarketing via text message generally: *nothing*. The TCPA is completely silent on the subject of unsolicited text messages. Of course, text messaging in its current form did not exist in 1991 when the TCPA was enacted,

---

[5] Nor are we bound by the Supreme Court's holding in another TCPA text-messaging case that the case was not mooted by an unaccepted settlement offer. *See Campbell–Ewald*, 136 S. Ct. at 670. The Court did not reach the unraised question of whether the plaintiff had alleged an injury in fact, in part because the defendant apparently never asserted that the plaintiff had failed to do so. *See id.* at 667–68. "[W]e are not bound by a prior decision's *sub silentio* treatment of a jurisdictional question." *Okongwu v. Reno*, 229 F.3d 1327, 1330 (11th Cir. 2000).

[6] Context matters. We are not suggesting that legislative history should play a role in statutory interpretation. Salcedo's allegation is undisputedly a violation of the statute as interpreted by the FCC. Nonetheless, because the Supreme Court has instructed us to consider "the judgment of Congress" in assessing Article III standing, we will consider the congressionally enacted findings as informative of that judgment. *See Spokeo*, 136 S. Ct. at 1549; *cf. Palm Beach Golf*, 781 F.3d at 1252 (citing House committee report).

10

but Congress has amended the statute several times since then without adding text messaging to the categories of restricted telemarketing.[7] As we have mentioned, it is only through the rulemaking authority of the FCC that the voice call provisions of the TCPA have been extended to text messages. At most, we could take Congress's silence as tacit approval of that agency action.

On the other hand, Congress's legislative findings about telemarketing suggest that the receipt of a single text message is qualitatively different from the kinds of things Congress was concerned about when it enacted the TCPA. In particular, the findings in the TCPA show a concern for privacy within the sanctity of the home that do not necessarily apply to text messaging. "Unrestricted telemarketing . . . can be an intrusive invasion of privacy," and "[m]any consumers are outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers," Congress found. Pub. L. No. 102-243, § 2, ¶¶ 5, 6. By contrast, cell phones are often taken outside of the home and often have their ringers silenced, presenting less potential for nuisance and home intrusion. It is thus not surprising that, after Congress found that the FCC "should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not

_____

[7] Following recent amendments, however, the TCPA will expressly include text messaging in its prohibitions on transmitting false caller ID information. Consolidated Appropriations Act, 2018, H.R. 1625, 115th Cong., Pub. L. No. 115-141, div. P, § 503(a) (2018) (to be codified at 47 U.S.C. § 227(e)).

11

considered a nuisance or invasion of privacy," *id.* ¶ 13, within a year it instructed the FCC that it may exempt "calls to a telephone number assigned to a cellular telephone service that are not charged to the called party," 47 U.S.C. § 227(b)(2)(C).

On text messaging generally, then, the judgment of Congress is ambivalent at best; its privacy and nuisance concerns about residential telemarketing are less clearly applicable to text messaging. Any possible deference to the FCC's interpretation of the TCPA[8]—the source of its application to text messaging—is not obviously relevant where the Supreme Court has specifically instructed us to consider the judgment of *Congress*. And congressional silence is a poor basis for extending federal jurisdiction to new types of harm. We take seriously the silence of that political branch best positioned to assess and articulate new harms from emerging technologies. *See Spokeo*, 136 S. Ct. at 1549 (citing *Lujan*, 504 U.S. at 578)). With this point of caution in mind, we now turn to the judgment of Congress about the specific harms that Salcedo has alleged he suffered when he received Hanna's message.

---

[8] In this case, we need not reach the issue of whether the agency's interpretation of the statute is entitled to any deference. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) (requiring deference to agency's interpretation of silent or ambiguous statute); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (allowing court to determine level of deference in proportion to agency's demonstration of persuasive reasoning); *cf., e.g., Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1320 (11th Cir. 2011) (rejecting *Chevron* deference where the statutory language was clear and unambiguous).

We consider the judgment of Congress when assessing standing because "Congress is well positioned to identify intangible harms that meet minimum Article III requirements." *Id*. As we have mentioned, Congress was concerned about "intrusive invasion[s] of privacy" into the home when it enacted the TCPA. Pub. L. No. 102-243, § 2, ¶ 5. Salcedo argues that the particular privacy interest Congress has identified is "the freedom from unwanted robocalls," but that observation is too general. As we have noted, a single unwelcome text message will not always involve an intrusion into the privacy of the home in the same way that a voice call to a residential line necessarily does. Certainly, Salcedo has not alleged that he was in his home when he received Hanna's message. As we have also noted, the 1992 amendment allowing the FCC to exempt free-to-receive calls to cell phones, 47 U.S.C. § 227(b)(2)(C), suggests less congressional concern about calls to cell phones. And by nature of their portability and their ability to be silenced, cell phone calls may involve less of an intrusion than calls to a home phone. We realize that Congress in 1991 could not have foreseen the explosion in personal cell phone use, the popularity of text messaging, and the near-extinction of the residential telephone line. But *Spokeo* instructs us to consider the judgment of Congress about the alleged harm, not to imagine what Congress might say about a harm it has not actually addressed.

We note that our sister circuit has reached the opposite conclusion in this

13

context. *See Van Patten*, 847 F.3d at 1043. The Ninth Circuit quoted many of these same findings, further noting Congress's purpose of "protect[ing] consumers from the unwanted intrusion and nuisance of unsolicited telemarketing phone calls and fax advertisements." *See* Pub. L. No. 102-243, § 2, ¶ 12. But that court stopped short of examining whether isolated text messages not received at home come within that judgment of Congress. Instead, it concluded that "Congress identified unsolicited contact as a concrete harm." *Van Patten*, 847 F.3d at 1043. We disagree with this broad overgeneralization of the judgment of Congress and have focused our own analysis on text messaging specifically.

Other stated concerns behind the TCPA are also inapposite to Salcedo's allegations. The congressional committee found telemarketing by fax problematic in part because "it occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax." H.R. Rep. 102-317, at 10 (1991), *quoted in Palm Beach Golf*, 781 F.3d at 1252. As we have noted, such a concern has little application to the instantaneous receipt of a text message. The judgment of Congress, then, provides little support for finding that Salcedo's allegations state a concrete injury in fact.[9]

---

[9] Congress also stated concerns not raised by either party here: concerns for public safety "when an emergency or medical assistance telephone line is seized," Pub. L. No. 102-243, § 2, ¶ 5; for the cost borne by consumers who use technology to avoid unwanted calls, *id.* ¶ 11; and for "commercial freedoms of speech and trade" that telemarketers enjoy, *id.* ¶ 9.

### E.  History

We now turn to history for guidance, because the case or controversy requirement of Article III "is grounded in historical practice." *Spokeo*, 136 S. Ct. at 1549. Thus, "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.*

With respect to his allegations of invasion of privacy, we look to the generally accepted tort of intrusion upon seclusion,[10] which creates liability for invasions of privacy that would be "highly offensive to a reasonable person." Restatement (Second) of Torts § 652B. The requirement that the interference be "substantial" and "strongly object[ionable]" instructs us that a plaintiff might be able to establish standing where an intrusion on his privacy is objectively serious and universally condemnable. *See id.* cmt. d (no liability for one, two, or three phone calls; liability "only when the telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff"). By contrast, Salcedo's allegations fall short of this degree of harm. We do not see this type of objectively intense interference where the alleged harm is isolated,

---

[10] Most of the accepted torts generally known as "invasion of privacy" involve privacy in the rather specific sense of one's right to be free from unwanted publicity. *See* Restatement (Second) of Torts § 652A. It is only the privacy tort of intrusion upon seclusion, *id.* § 652B, that bears any possible relationship to Salcedo's allegations.

momentary, and ephemeral.

The tort of intrusion upon seclusion also requires an intrusion "upon the solitude or seclusion of another or his private affairs or concerns." *Id.* § 652B. Although Salcedo argues that his cell phone is part of his private affairs, the Restatement contemplates a different category of intrusion into private affairs, listing examples including eavesdropping, wiretapping, and looking through one's personal documents. *See id.* cmt. b. Simply sending one text message to a private cell phone is not closely related to the severe kinds of actively intermeddling intrusions that the traditional tort contemplates. Salcedo's reasoning would equate opening your private mail—a serious intrusion indeed—with mailing you a postcard.

With respect to his allegations of nuisance, Salcedo asks us to compare the traditional torts of trespass and nuisance, but we find them also to be distinct both in kind and in degree. Trespass requires intentionally "enter[ing] land in the possession of the other," *id.* § 158(a), and private nuisance is "a nontrespassory invasion of another's interest in the private use and enjoyment of land," *id.* § 821D. Although, as we have noted, Congress was concerned about intrusions into the home when it enacted the TCPA, Salcedo has alleged no invasion of any interest in real property here. Furthermore, even in the context of nuisance to real property, in Florida, "[m]ere disturbance and annoyance as such do not in themselves

16

necessarily give rise to an invasion of a legal right." *A & P Food Stores, Inc. v. Kornstein*, 121 So. 2d 701, 703 (Fla. 3d Dist. Ct. App. 1960). Hanna's text message is thus not closely related to these traditional harms because it is not alleged to have infringed upon Salcedo's real property, either directly or indirectly.

Salcedo also asks us to consider the personal property torts of conversion and trespass to chattel. Conversion is an interference with chattel "which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." Restatement (Second) of Torts § 222A. Salcedo's allegations are nowhere near a complete and permanent dominion over his phone, so recourse to this serious kind of tort is unhelpful. The same is true for the tort of trespass to chattel, which involves intentionally "using . . . a chattel in the possession of another." *Id.* § 217(b). Traditionally, liability arises for this kind of trespass only when "the possessor is deprived of the use of the chattel for a substantial time" or when the trespass harms "the possessor's materially valuable interest in the physical condition, quality, or value of the chattel." *Id.* § 218(c) & cmt. e; *cf. United States v. Jones*, 565 U.S. 400, 426 (2012) (Alito, J., concurring) ("Trespass to chattels has traditionally required a physical touching of the property."). Thus, although Salcedo's allegations here bear a passing resemblance to this kind of historical harm, they differ so significantly in degree as to undermine his position. History shows that Salcedo's allegation is

17

precisely the kind of fleeting infraction upon personal property that tort law has resisted addressing.

We again note that our sister circuit has reached the opposite conclusion. *See Van Patten*, 847 F.3d at 1043. We decline to adopt its reasoning and instead embrace more fully the Supreme Court's instruction to look for a "close relationship" to a traditionally redressable harm. *See Spokeo*, 136 S. Ct. at 1549 (citing *Vt. Agency of Nat. Res.*, 529 U.S. 765, 775–77 (2000) (discussing traditional *qui tam* law in a case about *qui tam* relator Article III standing)). The Ninth Circuit's one-sentence review of history simply asserted, "Actions to remedy defendants' invasions of privacy, intrusion upon seclusion, and nuisance have long been heard by American courts, and the right of privacy is recognized by most states." *Van Patten*, 847 F.3d at 1043. But as we have more thoroughly explained, an examination of those torts reveals significant differences in the kind and degree of harm they contemplate providing redress for.

In sum, we find that history and the judgment of Congress do not support finding concrete injury in Salcedo's allegations.[11] Salcedo has not alleged anything

---

[11] Salcedo urges us to follow the reasoning that allowed us to find standing in *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1340–41 (11th Cir. 2017). The facts here do not permit us to do so. In *Perry*, we found standing under the Video Privacy Protection Act, 18 U.S.C. § 2710, for a plaintiff suing over privacy violations involving a mobile video app. *Perry* held that the plaintiff's allegations and the 1980s-era statute involved precisely the same substantive privacy right. Not so here. As we have discussed, both the judgment of Congress and history here reveal concerns about intrusions into the privacy of the home and interferences with property that do not readily transfer to the context of cell phones.

like enjoying dinner at home with his family and having the domestic peace shattered by the ringing of the telephone. Nor has he alleged that his cell phone was searched, dispossessed, or seized for any length of time. Salcedo's allegations of a brief, inconsequential annoyance are categorically distinct from those kinds of real but intangible harms. The chirp, buzz, or blink of a cell phone receiving a single text message is more akin to walking down a busy sidewalk and having a flyer briefly waived in one's face. Annoying, perhaps, but not a basis for invoking the jurisdiction of the federal courts. All told, we conclude that Salcedo's allegations do not state a concrete harm that meets the injury-in-fact requirement of Article III.

## F.  Quality, Not Quantity

To be clear, we are not attempting to measure how small or large Salcedo's alleged injury is. Article III standing is not a "You must be this tall to ride" measuring stick. "There is no minimum quantitative limit required to show injury; rather, the focus is on the qualitative nature of the injury, regardless of how small the injury may be." *Saladin v. City of Milledgeville*, 812 F.2d 687, 691 (11th Cir. 1987). Our assessment today is thus qualitative, not quantitative. We have assessed how concrete and real the alleged harm is, *Spokeo*, 136 S. Ct. at 1548, and we have concluded that it is not the kind of harm that constitutes an injury in fact. Some harms that are intangible and ephemeral may do so, but Salcedo's allegations of

19

the harm he suffered from receiving a single text message do not.

To be sure, under our precedent, allegations of wasted time can state a concrete harm for standing purposes. We have found standing where the harm was, for example, time wasted traveling to the county registrar's office, *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009); and correcting credit reporting errors, *Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1280 (11th Cir. 2017). These precedents strongly suggest that concrete harm from wasted time requires, at the very least, more than a few seconds. And on this point the judgment of Congress sheds a final ray of light. The TCPA instructs the FCC to establish telemarketing standards that include releasing the called party's line within five seconds of a hang-up, 47 U.S.C. § 227(d)(3)(B), demonstrating that, on the margin, Congress does not view tying up a phone line for five seconds as a serious intrusion.

Our responsibility to ensure that plaintiffs allege a real injury in fact requires us to look closely at their allegations in light of the statute, our precedent, history, and the judgment of Congress. Such inquiries will, of course, have differing outcomes depending on those inputs. *Compare, e.g.*, *Perry*, 854 F.3d at 1340–41 (finding standing based on intangible harm of statutory violation), *and Palm Beach Golf*, 781 F.3d at 1252 (same), *with Nicklaw v. CitiMortgage, Inc.*, 839 F.3d 998, 1003 (11th Cir. 2016), *reh'g denied*, 855 F.3d 1265 (11th Cir. 2017) (en banc)

20

(finding no standing because plaintiff alleged "neither a harm nor a material risk of harm"). We acknowledge that Congress, as a political entity, is well positioned to assess new harms in light of developments in technology and society, and to respond to the concerns of the American people about novel encroachments on life, liberty, and property. *See Spokeo*, 136 S. Ct. at 1549. The federal courts are not similarly tasked. We have only the power "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). And when a plaintiff comes to us without alleging a concrete harm, a real injury that states a case or controversy, we cannot do even that much.

## IV. CONCLUSION

We **REVERSE** the decision of the district court that Salcedo has standing to sue and **REMAND** with instructions to dismiss without prejudice the amended complaint.[12]

---

[12] Hanna has asked us to instruct the district court to dismiss Salcedo's amended complaint with prejudice. But a jurisdictional dismissal is entered without prejudice. *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008). "A dismissal 'without prejudice' refers to the fact that the dismissal is not on the merits." *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1094 n.7 (11th Cir. 1996). Although refiling may prove futile (Salcedo has already amended his complaint once in attempt to shore up his allegations), we and the district court presently lack jurisdiction to make that merits determination.

JILL PRYOR, concurring in judgment only:

Plaintiff John Salcedo sued defendants Alex Hanna and the Law Offices of Alex Hanna, P.A. (together, "Hanna") under the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227(b)(1)(A)(iii), after they sent him a single unwanted text message advertisement. I agree with the majority opinion that we lack subject matter jurisdiction because Salcedo has no standing to bring a TCPA claim. I write separately to emphasize my understanding that the majority's holding is narrow and the conclusion that Salcedo lacks standing is driven by the allegations in his complaint that Hanna sent him only one text message. The majority opinion—appropriately, in my view—leaves unaddressed whether a plaintiff who alleged that he had received multiple unwanted and unsolicited text messages may have standing to sue under the TCPA. With this understanding, I concur in the majority's judgment.