[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10199

_____

SUSAN DRAZEN,
on behalf of herself and other persons similarly situated,

Plaintiff-Appellee,

Godaddy.com, LLC,
a Delaware Limited Liability Company,

Defendant-Appellee,

*versus*

MR. JUAN ENRIQUE PINTO,

Movant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:19-cv-00563-KD-B

_____

Before WILSON, BRANCH, and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

We have in this case an argument over the meaning of coupon settlements. But, because there is an Article III standing problem with the class, we must vacate the District Court's approval of class certification and settlement in this case and remand for the opportunity to revise the class definition.

## I.

In August 2019, Susan Drazen filed a complaint against Go-Daddy.com, LLC ("GoDaddy") in the Southern District of Alabama alleging that GoDaddy had violated the Telephone Consumer Protection Act of 1991 ("TCPA") when it allegedly called and texted Drazen solely to market its services and products through a prohibited automatic telephone dialing system. *See* 47 U.S.C. § 227(a)(1), (b)(1)(A). Her case was consolidated with another case that had been litigated by Jason Bennett in the District

of Arizona,[1] Case No. 2:16-cv-03908 (D. Ariz. 2016), and a third related action filed by John Herrick was "incorporated into and resolved" by the resolution of this case, Case No. 2:16-cv-00254 (D. Ariz. 2016).[2]

Drazen and the plaintiffs in the two other related cases, Bennett and Herrick, purported to bring a class action on behalf of similarly situated individuals. After negotiating with GoDaddy, the three plaintiffs submitted a proposed class settlement agreement to the District Court. The class was defined as follows:

> (a) All persons within the United States who received a call or text message to his or her cellular telephone from Defendant from November 4, 2014 through December 31, 2016.
>
> (b) Excluded from the term "Settlement Class" are: (1) the trial judges presiding over the Actions; (2) Defendant, as well as any parent, subsidiary, affiliate or control person of Defendant, and the officers, directors, agents, servants or employees of Defendant; (3) the immediate family of any such person(s); (4) any Settlement Class Member who

---

[1] Bennett and Drazen filed a joint motion to transfer venue for Bennett's case to the Southern District of Alabama and to consolidate their cases. The District Court granted that motion.

[2] Bennett alleged that he received unsolicited calls from GoDaddy on his cellphone. Herrick alleged that he received promotional text messaging from GoDaddy on his cellphone.

timely and properly opts out of the settlement;
and (5) Class Counsel, their employees, and their
immediate family.

The proposed settlement was structured so that GoDaddy would make available $35 million in settlement funds for claims that were approved and for settlement costs. There were two compensation options for class members, both subject to pro rata reduction in the event that too many class members opted into the class. Class members could either receive $35 in cash or a $150 voucher to be used exclusively at GoDaddy. Based on the proposed settlement, class counsel agreed to ask for no more than 30% in attorneys' fees in addition to reimbursement of reasonable litigation costs and expenses. Class counsel also agreed to ask the District Court to award each named plaintiff $5,000, which GoDaddy did not oppose.

In response to this motion, the District Court ordered briefing on the application of *Salcedo v. Hanna*, 936 F.3d 1162, 1168 (11th Cir. 2019), to the class as proposed in the settlement agreement. We held in *Salcedo* that receipt of a single unwanted text message was not a sufficiently concrete injury to give rise to Article III standing, *Salcedo*, 936 F.3d at 1168, and the proposed class definition included individuals who received only one text message from GoDaddy. In their briefing, the parties put forth a new class definition:

(a)  All persons within the United States to whom, from
     November 4, 2014 through December 31, 2016, De-
     fendant placed a voice or text message call to their

cellular telephone pursuant to an outbound cam-
paign facilitated by the web-based software applica-
tion used by 3Seventy, Inc., or the software pro-
grams and platforms that comprise the Cisco Uni-
fied Communications Manager.

(b) Excluded from the term "Settlement Class" are (1)
the trial judges presiding over the Actions; (2) De-
fendant, as well as any parent, subsidiary, affiliate or
control person of Defendant, and the officers, direc-
tors, agents, servants or employees of Defendant; (3)
the immediate family of any such person(s); (4) any
Settlement Class Member who timely and properly
opts out of the settlement; and (5) Class Counsel,
their employees, and their immediate family.

After considering the briefing of the parties, the District
Court, citing our decision in *Cordoba v. DIRECTV, LLC*, 942 F.3d
1259, 1273 (11th Cir. 2019), determined that only the named plain-
tiffs must have standing. So, according to the District Court, the
standing problem could be resolved by removing Herrick, the text-
message only recipient, from being a named plaintiff. As to "absent
class members," who may have only received a single text message,
the District Court noted that these individuals would only make up

6                    Opinion of the Court                    21-10199

about seven percent of the class based on GoDaddy's representations.[3]

The District Court determined that "even though some of the included class members would not have a viable claim in the Eleventh Circuit, they do have a viable claim in their respective Circuit [because of a circuit split]. Thus, GoDaddy is entitled to settle those claims in this class action although this Court would find them meritless had they been brought individually in the Eleventh Circuit." In other words, the District Court allowed text-message only recipients to remain in the class, even though they lacked Article III standing under our standards.

After conducting a Rule 23(a) analysis for numerosity, commonality, typicality, and adequacy, and a Rule 23(b)(3) analysis for predominance, the District Court approved certification of the class for purposes of settlement in accordance with the proposed settlement agreement, on the condition that Herrick be removed as a named plaintiff.[4]  In response, the parties submitted an amended proposed settlement agreement removing Herrick as a class representative.  On June 9, 2020, the District Court then

---

[3] Based on GoDaddy's analysis, 91,000 individuals out of the approximately 1.26 million class members received only a single text message from Go-Daddy.

[4] The District Court did not conduct an analysis of the Rule 23(e)(2) factors, which is mandatory when "a class [is] proposed to be certified for purposes of settlement." Fed. R. Civ. P. 23(e).

certified the class for settlement with that change and preliminarily approved the settlement agreement, requiring any motions for attorneys' fees to be filed by July 24, 2020, any objections within the class to attorneys' fees be filed by July 31, 2020, and any objectors to object to the settlement itself by August 31, 2020.

Next, on July 24, 2020, class counsel moved for attorneys' fees equal to 30% of the total settlement fund of $35 million, which came out to $10.5 million, and $105,410.51 in costs. On August 11, 2020, the District Court approved class counsel receiving 25% of the common fund, $8.75 million, in attorneys' fees since "the issues in this case were not complex" and the "average benchmark" was 25%. The District Court also granted the $105,410.51 in costs and expenses. Finally, the District Court granted $5,000 to Drazen, Bennett, and Herrick for their services as settlement class members.

Then, on August 31, 2020, Juan Pinto objected to the settlement. He explained that while the class notice had identified an objection deadline of August 31, 2020, the District Court had awarded attorneys' fees on August 11, 2020, twenty days ahead of the objection deadline. For our purposes, his most important argument is that this settlement was subject to the Class Action Fairness Act ("CAFA") because it was a coupon settlement under 28 U.S.C. § 1712(e).[5] In other words, because GoDaddy vouchers

---

[5] Pinto also argued that the class notice violated due process. He does not raise that argument before us, so we won't consider it further here.

were a part of the settlement, Pinto believed that these vouchers were coupons under CAFA.[6]  The punchline is that if the vouchers are coupons under CAFA then the attorneys' fees for class counsel in this case would be subject to heightened judicial scrutiny and would have to be based on the "value to class members of the coupons that are redeemed."  28 U.S.C. § 1712(a), (e).  In other words, basing attorneys' fees on the common fund value of $35 million would be out the window, and a more complicated calculation based on coupon redemption and the cash settlement fund would take its place.  In any event, attorneys' fees would likely be lower than what the District Court had calculated under its original method.[7]

---

[6] *See* 28 U.S.C. § 1712(a) ("If a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed."); *id.* § 1712(e) ("In a proposed settlement under which class members would be awarded coupons, the court may approve the proposed settlement only after a hearing to determine whether, and making a written finding that, the settlement is fair, reasonable, and adequate for class members. The court, in its discretion, may also require that a proposed settlement agreement provide for the distribution of a portion of the value of unclaimed coupons to 1 or more charitable or governmental organizations, as agreed to by the parties. The distribution and redemption of any proceeds under this subsection shall not be used to calculate attorneys' fees under this section.").

[7] Pinto argued that only the redeemed coupons could be used for a percentage-based fee and that a lodestar could be used for the cash portion of the settlement.

In response to Pinto's argument that the District Court had prematurely awarded attorneys' fees, the District Court amended its attorneys' fees order to make all its previous awards "subject to a final evaluation and review of any objections and at the final approval hearing." The District Court did not alter the substance of the awards at this time.

After receiving further briefing from both the parties and Pinto, the District Court issued its final order, incorporating its earlier findings that the class met the standards of Rule 23(a) and Rule 23(b)(3). It noted that there were 1,237,296 class members in the settlement and that as of October 22, 2020, there were only 24,059 completed claims, 11,662 for cash and 12,396 for vouchers. The District Court addressed Pinto's objection, deciding that the settlement was not a coupon settlement under CAFA. However, the District Court did decide to reduce attorneys' fees to 20% of the common fund, or $7,000,000, because "the results obtained for the plaintiffs d[id] not justify an award at the high end of the benchmark."[8] And, finally, the District Court awarded the $105,410.51 in costs that class counsel had requested through the plaintiffs.

---

[8] Separately, the District Court also disapproved the $5,000 awards for the lead plaintiffs since our decision in *Johnson v. NPAS Sols., LLC*, 975 F.3d 1244, 1260 (11th Cir. 2020), forbade that practice.

And, with that, the class action settlement received final approval with attorneys' fees and costs. Pinto timely appealed.[9]

## II.

We review the District Court's order granting final approval to the settlement for abuse of discretion. *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1216 (11th Cir. 2012). We review questions of statutory interpretation, like the application of CAFA to coupon settlements, de novo. *United States v. Lumley*, 135 F.3d 758, 759–60 (11th Cir. 1998). And we review de novo our own subject-matter jurisdiction. U.S. Const. art. III, § 2; *Williams v. Chatman*, 510 F.3d 1290, 1293 (11th Cir. 2007) ("Federal courts are obligated to inquire into subject-matter jurisdiction *sua sponte* whenever it may be lacking." (internal citation and quotation marks omitted)).

## III.

After that complicated procedural history, we start with the basic question of whether we have subject-matter jurisdiction in this case. The parties did not brief the issue before us, apparently assuming the class definition passed Article III standing muster. Not to hide the ball, we hold that the class definition does not meet Article III standing requirements, so we vacate the District Court's

---

[9] Pinto and the parties submitted to the District Court a proposed settlement after Pinto's appeal, which the District Court denied.

21-10199            Opinion of the Court                11

decision to grant final approval of the settlement and remand to give the parties an opportunity to revise the class definition.

Our starting point is the Supreme Court's decision in *Frank v. Gaos*, 139 S. Ct. 1041 (2019). There, five class members objected to the district court's preliminary approval of a settlement because the settlement agreement only provided for *cy pres* relief. *Gaos*, 139 S. Ct. at 1045. After a hearing on the matter, the district court gave the settlement final approval, and the class members appealed to the Ninth Circuit. *Id.* After the parties had briefed the merits issue of *cy pres* relief before the Ninth Circuit but before the Ninth Circuit issued a decision, the Supreme Court decided *Spokeo, Inc. v. Robins*, 578 U.S. 330, 136 S. Ct. 1540 (2016). In *Spokeo*, the Supreme Court held that a plaintiff does not automatically satisfy Article III standing requirements, just because "a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."[10] *Gaos*, 139 S. Ct. at 1045 (quoting *Spokeo*, 578 U.S. at 341, 136 S. Ct. at 1549). The Ninth Circuit affirmed settlement of the class action on the merits without addressing the

---

[10] Article III standing has three components: 1) injury-in-fact that is concrete and particularized and actual and imminent, 2) causation, and 3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 2136–37 (1992). *Spokeo* was specifically concerned with the concreteness prong of the injury-in-fact inquiry. *Spokeo*, 578 U.S. at 339, 136 S. Ct. at 1548. In *Spokeo*, the Supreme Court explained that plaintiffs must still demonstrate a concrete injury, even when a plaintiff has alleged a statutory violation. *Id.* at 341, 136 S. Ct. at 1549. In other words, a statutory violation does not necessarily meet the requirements of Article III for standing purposes.

potential Article III standing problem, and the objectors appealed to the Supreme Court. *Id.*

The question before the Supreme Court was "whether a class action settlement that provides a *cy pres* award but no direct relief to class members satisfies the requirement that a settlement binding class members be 'fair, reasonable, and adequate.' Fed. Rule Civ. Proc. 23(e)(2)." *Id.* But rather than address the certified question, the Supreme Court evaluated the Article III standing issue and explained that Article III's standing requirements "extend[] to court approval of proposed class action settlements." *Id.* at 1046. The Supreme Court explained that while ordinarily in non-class litigation parties may settle whenever they want without court intervention, Fed. R. Civ. P. 41(a)(1)(A), not so in class litigation, where a settlement may only be finalized with district court approval, Fed. R. Civ. P. 23(e). *Gaos*, 139 S. Ct. at 1046. And, the *Gaos* court explained, "federal courts lack jurisdiction if no named plaintiff has standing." *Id.* The Supreme Court vacated the settlement and remanded the case in order for the lower courts to consider the standing issue "in light of *Spokeo*" because "[r]esolution of the standing question should take place in the District Court or the Ninth Circuit in the first instance." *Id.*

From *Gaos*, we take the following: even at the settlement stage of a class action, we must assure ourselves that we have Article III standing at every stage of the litigation. U.S. Const. art. III, § 2; *United States v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019) ("To have a case or controversy, a litigant must establish that he

has standing, which must exist throughout all stages of litigation."); *see TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) (evaluating Article III standing of plaintiffs on appeal after a full trial below). That requirement is derived from Article III as well as the unique nature of class action settlements as laid out in Rule 23(e), which require court approval.

Beyond the holding in *Gaos*, we have another lodestar principle that guides our analysis, and that principle is drawn from *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021). There are two key takeaways from *TransUnion* for our purposes here: 1) To satisfy the concrete injury requirement for standing, a plaintiff alleging a statutory violation must demonstrate that history and the judgment of Congress support a conclusion that there is Article III standing; 2) "Every class member must have Article III standing in order to recover individual damages." *TransUnion*, 141 S. Ct. at 2204–05, 2208. The first point is mainly a refining and reiteration of *Spokeo*. *See Spokeo*, 578 U.S. at 340–41, 136 S. Ct. at 1549. The second requires a bit more discussion.

## IV.

To understand how *TransUnion*'s rule that every class member must have Article III standing to recover damages fits into this case, we must return to the record below. When the District Court certified the class under that definition, it was operating under two principles. First, citing *Cordoba*, it said that only the named plaintiff must have standing. *Cordoba*, 942 F.3d at 1273. Second, citing the Fifth Circuit's decision in *In re Deepwater*

*Horizon*, the District Court decided that even if there were plaintiffs in the class definition who did not have standing, because they might have standing in another circuit, we should allow them to remain a part of the class here because it is a nationwide class action. *See In re Deepwater Horizon*, 739 F.3d 790, 807 (5th Cir. 2014). For instance, the District Court pointed out that we held in *Salcedo v. Hanna* that a plaintiff has not suffered a concrete injury for Article III standing purposes when she has received a single unwanted text message. *See Salcedo v. Hanna*, 936 F.3d 1163, 1172 (11th Cir. 2019). The District Court contrasted our holding with that of the Ninth Circuit in *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017), which it interpreted as holding that a single unwanted text message is sufficient to establish a concrete injury for Article III standing purposes.

So, the District Court conditioned certification on the removal of the text-message-only recipient, Herrick, as a named class representative to comply with *Cordoba*. And the District Court reasoned that the class definition could remain as it was, because the plaintiffs in the class who had only received one unwanted text message would have standing in another circuit to bring suit.

Our problem in this case is that the District Court's granting of this class definition runs headlong into *Cordoba* and *TransUnion*.[11] Starting with the District Court's use of *Cordoba*, we

---

[11] Of course, we do not fault the District Court for failing to be clairvoyant. The District Court issued its grant of certification of the class for settlement

acknowledge that *Cordoba* says that "[f]or a class to be certified, [only] the named plaintiff must have standing." *Cordoba*, 942 F.3d at 1267. But *Cordoba* also counsels that "whether absent class members can establish standing may be exceedingly relevant to the class certification analysis required by Federal Rule of Civil Procedure 23," and "at some time in the course of the litigation the district court will have to determine whether each of the absent class members has standing before they could be granted any relief." *Id.* at 1273, 1274. So, the *Cordoba* court located the standing analysis of unnamed class members at the certification stage in Rule 23 rather than as a standalone standing requirement under Article III of the Constitution itself. Regardless of whether standing presents itself as an inquiry under Rule 23 or Article III for certification purposes, *TransUnion* has affirmed the reasoning of *Cordoba*. To recover individual damages, all plaintiffs within the class definition must have standing. *TransUnion*, 141 S. Ct. at 2208. Here, the District Court's certification of the class was only pursuant to a settlement. So, the *Cordoba* inquiry into standing for certification purposes through Rule 23 merges with the *TransUnion* analysis of damages recovery to lead us to the following conclusion: when a class seeks certification for the sole purpose of a damages

---

and preliminary approval of the class settlement on June 9, 2020, a little over a year before the Supreme Court's decision in *TransUnion*, and its final order approving class settlement on December 23, 2020, still six months before *TransUnion* was decided. But we are bound to now apply the Supreme Court's decision in *TransUnion* in this appeal. *See generally United States v. Campbell*, 26 F.4th 860 (11th Cir. 2022) (en banc).

settlement under Rule 23(e), the class definition must be limited to those individuals who have Article III standing.  If every plaintiff within the class definition in the class action in *TransUnion* had to have Article III standing to recover damages after trial, logically so too must be the case with a court-approved class action settlement.

Before turning to the standing analysis as applied to the plaintiffs in this case, we address the District Court's second guiding principle that unnamed plaintiffs with no standing in our circuit may be entertained as part of the nationwide class because they have might standing in another circuit.  The case the District Court cites for this proposition, *In re Deepwater Horizon*, says nothing of the sort.  In that case, the Fifth Circuit declined to choose between two different methods of evaluating class standing under Article III—one based on the named plaintiffs and the other based on the class definition—because the class at issue met both standards. *See In re Deepwater Horizon*, 739 F.3d at 803 ("As contemplated by the Class Definition, therefore, the class contains only persons and entities that possess Article III standing.").  At most, *In re Deepwater Horizon* stands for the proposition that absent class members need not "prove their claims prior to settlement under Rule 23(e)."[12] *Id.* at 807.  Nowhere does that case suggest that we check Article III standing at the door when dealing with a class action.

---

[12] The District Court seems to have conflated standing with merits when it said that "the class includes absent members who received only one text but would have a viable claim in their respective Circuit. So the issue is whether this Court can certify a class wide settlement that includes claims that are

21-10199               Opinion of the Court                    17

*TransUnion* says that we can't award damages to plaintiffs who do not have Article III standing.  And Article III standing goes to the heart of our jurisdiction to hear cases in the first place.  We cannot, therefore, check our Article III requirements at the door of the class action.  Any class definition that includes members who would never have standing under our precedent is a class definition that cannot stand.  With that background, we turn to the standing analysis of the actual plaintiffs in this case.

## V.

The District Court certified the class for settlement with the following class definition:

(a) All persons within the United States to whom, from November 4, 2014 through December 31, 2016, Defendant placed a voice or text message call to their cellular telephone pursuant to an outbound campaign facilitated by the web-based software application used by 3Seventy, Inc., or the software programs and platforms that comprise the Cisco Unified Communications Manager.

So, the universe of plaintiffs under this definition includes any individual who received a text message or phone call on their cellphone

―――――――――――――

viable in some circuits but not in others . . . . [E]ven though some of the included class members would not have a viable claim in the Eleventh Circuit, they do have a viable claim in their respective Circuit."  Article III standing does not go to the merits or viability of the claim itself but rather to our jurisdiction to hear the case.

from GoDaddy in the specified period.  As discussed above, under *Salcedo*, we have said that a single unwanted text message is not sufficient to meet the concrete injury requirement for standing.  So, the class definition cannot stand to the extent that it allows standing for individuals who received a single text message from Go-Daddy.  Otherwise, individuals without standing would be receiving what is effectively damages in violation of *TransUnion*.

The more difficult question is whether individuals who have received a single cellphone call also have standing.[13]  *See Salcedo*, 936 F.3d at 1170 ("[C]ell phone calls may involve less of an intrusion than calls to a home phone.").  Without the benefit of *TransUnion*, we held in *Glasser v. Hilton Grand Vacations Company, LLC*, addressing the same statute as the one in this case, that "receipt of more than one unwanted telemarketing call" was sufficient to meet the "concrete injury" requirement for Article III standing.  *Glasser v. Hilton Grand Vacations Co.*, 948 F.3d 1301, 1306 (11th Cir. 2020) (quoting *Cordoba*, 942 F.3d at 1270 ("The receipt of more than one unwanted telemarketing call made in violation of the provisions enumerated in the TCPA is a concrete injury that meets the minimum requirements of Article III standing.")).[14]

---

[13] We note that the named plaintiffs Bennett and Drazen alleged receiving multiple telephone calls, which is sufficiently similar to the tort of intrusion upon seclusion to meet the minimum requirements of Article III standing under our current case law.  *Cordoba*, 942 F.3d at 1270; *but see infra* n.14.

[14] As a side note, we have been less than a model of clarity in *Cordoba* and *Glasser* for purposes of Article III standing analysis.  *Cordoba* involved an FCC

regulation promulgated pursuant to the TCPA that "requir[ed] telemarketers to maintain lists of individuals who have asked not to receive calls from particular callers – so-called 'internal do-not-call lists.'" *Cordoba*, 942 F.3d at 1264. And the only plaintiffs in the class action in that case who had standing were those who received telemarketing calls after they had asked not to be called. *Id.* at 1272. *Glasser*, which dealt with the same statute as the one in our case, involved two individuals who alleged that they had received calls from automatic dialing systems in violation of the TCPA. *Glasser*, 948 F.3d at 1305–06. There, we said that because *Cordoba* had held that "more than one unwanted telemarketing call" was sufficient to confer standing, the plaintiffs in *Glasser* had standing. *Id.* at 1306.

We have a problem here. "Unwanted" in *Cordoba* had a specific meaning—individuals who were called after asking not to be called. "Unwanted" in the context of the statute at issue in our case and in *Glasser* refers to the fact that individuals, though never asking not to be called, were called by allegedly prohibited means under the TCPA—automatic telephone dialing systems. So, to us, the standing analysis in *Cordoba* and the standing analysis in *Glasser* and our case may not necessarily be the same. In *Cordoba*, people asked not to be called—period. In *Glasser* and in our case, the individuals are not complaining about the fact they were called. They are complaining about the fact that the automatic telephone dialing system did the calling. In other words, the injury is not the call but rather the dialing system used, and it is not clear that GoDaddy's compliance with the statute would have prevented the plaintiffs from being called. The difference between *Cordoba* and *Glasser* and our case may present the need to reexamine *Glasser* in the future because it may affect both the injury-in-fact requirement and the causation analysis. At the very least, *Cordoba* and *Glasser* were decided pre-*TransUnion*, and under *TransUnion* plaintiffs have the burden of establishing Article III standing for statutory violations by alleging facts that would allow us to find a common-law analogue to the injury in question. *See TransUnion*, 141 S. Ct. at 2204. *Glasser* conducted no historical analysis and is suspect on that ground alone.

But we did not decide whether a single phone call to a cellphone was a concrete injury for Article III standing purposes. *See Salcedo*, 936 F.3d at 1169, 1172 n.11 ("As we have discussed, both the judgment of Congress and history here reveal concerns about intrusions into the privacy of the home and interferences with property that do not readily transfer to the context of cell phones.").

Because we have not received briefing on whether a single cellphone call is sufficient to meet the concrete injury requirement for Article III standing and because *TransUnion* has clarified that courts must look to history to find a common-law analogue for statutory harms, we think the best course is to vacate the class certification and settlement and remand in order to give the parties an opportunity to redefine the class with the benefit of *TransUnion* and its common-law analogue analysis.

**VACATED AND REMANDED.**